[No. 19664.   Department Two.   March 25, 1926.]

PETER WICKMAN, *Respondent*, v. TWIN HARBOR STEVE-
DORING & TUG COMPANY, *Appellant*.[1]

[1] MASTER AND SERVANT (101)—ASSUMPTION OF RISK—PROMISE TO
REMEDY DEFECT. A stevedore does not assume the risks from
continuing his work of stowing away lumber, knowing of the
dangers from working without a longer bull line and sufficient
stowage to make the floor of the cargo level, where, upon com-
plaint made about the noon. hour, the boss promised to send
down the necessary line and stowage, whereupon plaintiff con-
tinued to work until four o'clock, when he was injured.

[2] SAME (90)—ASSUMPTION OF RISKS—USE OF INADEQUATE APPLI-
ANCES—RELIANCE ON PROMISE. A stevedore does not, as a matter
of law, assume the risk in handling heavy timbers in a dangerous
manner, made necessary for lack of appliances which he expected
to receive in a short time as promised.

[3] SAME (43, 161)—NEGLIGENCE OF MASTER—SAFE PLACE—PLATFORM
—CHANGING CONDITIONS—QUESTION FOR JURY. Where, in loading
timber in the hold of a ship, the master's failure to furnish
stowage to keep the floor of the cargo level was intimately con-
nected with his failure to furnish a longer line, as he had
promised, it is not error to refuse to take that matter from the
consideration of the jury upon the issue of the master's failure
to provide a safe place to work, under the changing conditions.

Appeal from a judgment of the superior court for
Grays Harbor county, Campbell, J., entered May 27,
1925, upon the verdict of a jury rendered in favor of
the plaintiff, in an action for personal injuries.  Af-
firmed.

*Theodore B. Bruener,* for appellant.
*James R. Gates,* for respondent.

PARKER, J.—The plaintiff, Wickman, commenced this
action in the superior court for Grays Harbor county,
seeking recovery of damages for personal injuries
which he claims to have suffered as the result of the

[1]Reported in 244 Pac. 268.

negligence of the defendant stevedoring company, while he was employed by it in stowing lumber in the hold of a steamship being loaded by it at Aberdeen for an ocean voyage. The alleged negligence is, in brief, that the defendant negligently failed to furnish him, though requested by him and promised by it, a sufficient necessary bull line to enable him to efficiently and safely parbuckle the heavy timbers into place in the extreme outer portion of the wings of the ship, and also sufficient stowage, meaning lumber of small sizes, to enable him to keep the surface, or floor of the cargo as it is called, reasonably level during the progress of the loading, so as to make his working place and appliances reasonably safe as the loading progressed. The plaintiff was injured while attempting to place in the outer portion of the wing of the ship, and on a tier of timbers reaching well up to near the 'tween deck, one of the heavy timbers, in size 22 inches square and 36 feet long, by the use of grabhooks on the end of a bull winch line. The chipping out of one of the hooks causing the timber to roll suddenly towards him, his stepping back to get out of its way, his falling partly into an unfilled and unprotected open space in the surface or floor of the already placed cargo, and the timber rolling on, or against, his leg, caused the injury of which he complains. A trial upon the merits in the superior court resulted in verdict and judgment awarding to the plaintiff recovery in the sum of $8,500, from which the defendant has appealed to this court.

The ship had several holds, the largest of which being the one in which respondent was working. The hold was about 90 feet long and about 48 feet wide, that being the full width of the ship, in the clear, inside. The lower part of the hold was some 20 feet high up to the 'tween deck. The hold had two hatches, the after

one being about 20 feet wide and 30 feet long, fore and aft, the forward one being the same width and about 15 feet long, fore and aft. Under the sides of the hatches were two rows of three stanchions each, extending from the bottom of the ship to the upper deck. There was one under each corner of the large hatch, and one under each side of the small hatch.

There was a hoisting winch on the upper deck just after the large hatch. The lines from this winch were used to carry the cargo from the wharf and lower it down through the large hatch into the hold. There was also a bull winch on the upper deck near the small hatch. The lines from this winch ran down through the small hatch through conveniently placed blocks and finally through blocks, as it might be changed in position from one to the other, just under the 'tween deck at the side of the ship. These lines were used to move the heavy timbers in place after they were lowered into the hold by the hoisting winch. One of the recognized efficient and safe things to do, as the loading progressed, was to keep the surface of the cargo as nearly level as possible and with as few open spaces therein as possible, to the end that the pieces could be moved about and put in place with greater efficiency and safety. This maintained level of the cargo, as the loading progressed, is called the floor of the cargo.

At the time in question, the floor of the cargo had been built up to within about 7 feet of the 'tween deck, with some dangerous holes or open spaces left in the floor of the cargo, caused, as it is claimed, by a failure of the appellant to furnish for their filling, as the loading progressed, a sufficient amount of small material, commonly called stowage. The hole, or open space of this nature, here in question was between the two stanchions under the right side of the large hatch,

which space was about 12 inches wide, 4 feet deep and 30 feet long, and over which the respondent and his fellow workers were required to do a large part of their work in moving the timber into the wing of the ship on that side. For the moving of the timbers from under the hatch where they were landed from above, over the surface or floor of the cargo, there was attached to the end of the bull winch line large grab-hooks, which could be used with safety, except for actually lifting the timbers off of the floor. With this device the timbers were moved or dragged over the floor of the cargo to their place. After the cargo had been built up to within about 7 feet of the 'tween deck, it became necessary, in order to fully utilize the remaining space below the 'tween deck, to build the cargo up to within a foot or so of the 'tween deck, commencing at the side of the ship. This is done by building one layer about six feet wide inward from the side of the ship, a second one a little narrower, and so progressing with two, three and four tiers in steps. This is called winging up. In order to accomplish this, the recognized efficient and safe method, when it is done with heavy timbers, as was the case here, is to do it by a parbuckling process with a bull line fastened on to the end of the bull winch line run through a block just under the 'tween deck and at the side of the ship, and thence down to and over and under the timber to be so placed and back to a hook near the block. The drawing of the line through the block by the bull winch and its line will then cause the timber to roll up into place and bring it onto one of the steps, and close up under the 'tween deck, if it be the purpose to move the particular timber to the highest step.

Respondent was furnished a short bull line which proved to be of sufficient length to enable him and his

crew, by parbuckling, to put in place timbers in winging up in the forward part of the hold where the bull winch line and the short bull line could be effectively so used; the bull winch line, as we have noticed, coming directly down through the small hatch so that it would serve that part of the hold in winging up with a short bull line. But when it came to winging up opposite the large hatch, the bull winch line and bull line which were furnished were not of sufficient length to reach through the block down to, over and under the timber back to the hook near the block. Therefore, the appliance at hand rendered it impossible for respondent to wing up at that place, by parbuckling.

A day or two before respondent was injured, he asked the boss to send down a longer bull line to parbuckle with, and also to send down stowage, meaning small pieces to enable him to fill the holes and make the surface of the cargo level and safe. He was promised that a longer bull line and also stowage would accordingly be sent down; no specified time being mentioned, but enough was said to assure him that the necessities of the work, both as to safety and efficiency, would soon be so supplied. The respondent and his crew then proceeded with their work, and, being unable to parbuckle the large timbers in winging up opposite the large hatch, respondent felt compelled to draw the timbers up into place by the use of the bull winch line and the short bull line by direct action with the grabhooks on the end of the bull line, the line so made up having been run through the block just under the 'tween deck at the outer side of the ship. The particular timber in question was thus seized upon with the grabhooks and drawn up over two unfinished tiers; that is, being almost bodily lifted, not rolled, with a view of placing it upon a tier which was already about

four feet above the cargo floor. One of the hooks chipped out and left the heavy timber free to slide or roll back towards the middle of the ship. Respondent being suddenly warned of the danger he was in, stepped back into the open space between the stanchions under the side of the large hatch, and, as he did so, almost instantly one end of the timber being a little ahead of the other caught his leg against the side of the open space, causing the injury in question.

There is some evidence in the record indicating rather plainly that to attempt to raise the timber up onto the partly built-up tiers by use of the grabhooks was a somewhat dangerous process, because of the possibility of the hooks chipping out. Respondent himself apparently recognized this, but proceeded upon the theory that he would not have to pursue this method of putting the timbers in place upon the tiers except for a short time, relying upon his request for a longer bull line and the promise of the boss to furnish such line, to enable the winging up to be done by parbuckling, and also relying upon the promise of the boss to send down stowage for the making of the floor of the cargo level; and thus make the place and appliances more efficient and safe for the work.

There is no serious controversy over these facts, other than as to respondent's request for stowage and a longer bull line, and the promise of the boss to furnish them. We think, however, that the evidence warranted the conclusion that respondent's requests were made to the boss, whose duty it was, as representative of appellant, to furnish respondent material for the correction of these defects, and who was well advised of the necessity thereof, both as to efficiency and safety. We also think that respondent proceeded with the work as best he could, in the belief that his

requests would soon be complied with so he could more safely proceed with the work. The request for a longer bull line was particularly pressed upon the boss by respondent near the noon hour of the day on which he was injured, that being about the time of the commencement of the winging up opposite the large hatch when a longer bull line became particularly necessary to parbuckling at that place. Respondent was injured about 4:00 o'clock in the afternoon.

[1] It is contended by appellant's counsel that the trial court should have taken the case from the jury and decided as a matter of law that respondent could not recover; appropriate motions being timely made in that behalf. This contention seems to be rested principally upon the theory that respondent voluntarily continued in the work, using the alleged defective appliance, and continued in the work over the alleged unsafe open spaces in the floor of the cargo, after his request for a longer bull line and stowage had been made, for such length of time as he must have known appellant was not going to comply with his requests, and that he, therefore, voluntarily assumed the risk of the want of remedying such defect as existed for want of stowage and a longer bull line. Under all the circumstances, we think, there plainly was not such a period of acquiescence in the conditions as to call for a decision as a matter of law that respondent had, by his acquiescence, voluntarily assumed the risks incident thereto. This court has rendered a number of decisions clearly supporting this view. They are cited and reviewed at some length in *Johnson v. North Coast Stevedoring Co.*, 109 Wash. 236, 186 Pac. 663. The decision of the United States circuit court of appeals for this circuit in *Great Northern R. Co. v. McDermid*, 177 Fed. 105, also lends strong support to this view.

[2] It is further contended that, in any event, the attempt on the part of respondent to put the timbers in place with grabhooks in the winging up was so manifestly and inherently dangerous that respondent assumed the risk, and was guilty of contributory negligence in so handling the timbers. There is room for so arguing as a question of fact, but it seems to us it cannot be so decided as a matter of law under the circumstances here shown.

[3] It is contended that, in any event, appellant is entitled to be awarded a new trial, because of the trial court's refusal to take from the jury all consideration of appellant's negligence in failing to furnish stowage for the filling of the open spaces between the large pieces so as to keep the floor of the cargo fairly level and thus a safer place for respondent and his crew to work in. It may be that the failure of the furnishing of stowage material for this purpose would not, within itself, be such a failure of duty on the part of appellant to furnish a safe place to work as to entitle respondent to recover in this action. But we think, under the circumstances here shown, that a failure to furnish stowage and the promise so to do were not wholly foreign to the question of appellant's negligence in the failure to furnish a longer bull line, so that timbers could be put in place in the winging up by the safe and efficient method of parbuckling. Manifestly, the handling of heavy timbers in the loading, including the winging up, would be fraught with greater dangers to respondent and his crew by working on a floor of the cargo with holes and open spaces therein, such as were shown to exist in this case, than upon a cargo floor free from such dangers. The evidence seems to us to warrant the jury in believing that the cargo was to consist of small, as well as large, pieces, and that the smaller

pieces could have been furnished, as the loading progressed, in such manner as to keep the cargo floor fairly level and free from open spaces therein as the loading progressed, a condition desirable to be maintained generally in the loading of cargoes both as a matter of efficiency and safety.

In this connection, it seems to be argued that there is not here presented a question of appellant furnishing respondent and his crew a safe place to work, because of changing conditions as the work progressed; that is, that the open spaces in the floor of the cargo were necessarily incident to changing condition, as in the erection of any structure. This, of course, is not a safe place to work problem as applicable to working in fixed surroundings. It is, however, a question of appellant furnishing to respondent and his crew proper material and appliances, to the end that they may make the place as reasonably safe, as well as efficient, as under all the conditions of the work that may be done, as the work progressed. We are of the opinion that the court did not err in allowing to remain with the jury, for its consideration, the question of appellant's fault in failing to furnish respondent and his crew stowage in connection with appellant's alleged failure to furnish a longer bull line. In other words, we think the failure to furnish stowage, following the promise to do so, was so intimately connected with respondent's injury as having some bearing thereon, that the trial court did not err in refusing to withdraw that fact from the jury's consideration.

We are of the opinion that appellant has had a fair trial, and that the evidence supports the judgment. It is, therefore, affirmed.

TOLMAN, C. J., MAIN, and MITCHELL, JJ., concur.